McKEE, Chief Judge,
concurring in part and dissenting in part.
Today we hold that a group of African-American parents and students have not produced sufficient evidence to have a jury decide if race is a factor in how African-American students are assigned to special education classes in their school district. My colleagues reach this result even though the record contains numerous issues of disputed fact that would support plaintiffs’ claims if a jury resolved those disputes in the plaintiffs’ favor.
The allegations here are not pretty. No one likes to think that a school district, especially one with an outstanding educational reputation, allows race to be a factor in assigning African-American students to special education classes. However, there is sufficient evidence on this record to establish that a trial is warranted to determine whether this school district did exactly that. I therefore write separately to express my strong disagreement with my colleagues’ conclusion that these plaintiffs cannot survive summary judgment.
Despite that strong disagreement, I do agree that the Gaskin settlement bars the Title VI and § 1983 claims that have been brought against the Pennsylvania Department of Education (“PDE”) as discussed in Section VII.A of the Majority Opinion.[1]
The District Court’s August 19, 2009 ruling that the settlement agreement bars claims against the PDE sets forth the relevant language of the settlement agreement. That agreement identified the plaintiffs as: “representatives of a certified class consisting of all school-age students with disabilities in Pennsylvania who have been denied a free appropriate education in regular classrooms with individualized supportive services, individualized instruction, and accommodations they need to succeed in the regular education classroom.” Blunt v. Lower Merion School District, 262 F.R.D. 481, 491 (E.D.Pa. 2009). The agreement was in effect from September 19, 2005 to September 19, 2010. Id. Although, as counsel for CBP noted at oral argument, those claims are very different from the claims here, the language of the settlement agreement is very broad in its scope and provides in part as follows:
[i]n consideration of the performance of PDE’s obligations under the Settlement Agreement, the plaintiffs, individually and collectively hereby remise, release, and forever discharge each of the defen *305 dants [...] from all actions and causes of action, suits, ... claims and demands whatsoever ..., known or unknown, foreseen or unforeseen, particularly those which were or could have been set forth in Gaskin v. Pennsylvania Department of Education, No. 94-CV-4048 (E.D.Pa.), or which any of the plaintiffs ever had or now has, ... or may have, for ... any reason of any cause, ... whatsoever arising out of or related to the claims brought by the plaintiffs against the defendants in the Gaskin case from the beginning of the world to the effective date of the Settlement AgreementL]
Id. (ellipses and bold type and italics emphasis in original, underline emphasis added). The claims in this suit, though quite different from the claims in Gaskin, are clearly “related to the claims brought by the plaintiffs ... in the Gaskin case.” However, for the reasons that follow, I cannot agree that Concerned Black Parents, Inc. (“CBP”) lacks standing (as discussed in Section VII.B of the Majority Opinion) or that the District Court properly granted summary judgment on the claims that these Plaintiffs brought against the Lower Merion School District (“LMSD”) under Title VI and 42 U.S.C. § 1983 (as discussed in Section VTI.D of the Majority Opinion).
I. CBP’S STANDING
A. General Principles
As Judge Greenberg explains, Article III requires a plaintiff to demonstrate a sufficient interest in the outcome of litigation to establish a “case or controversy” and thus have standing to sue on the plaintiffs own behalf or as a representative of others.[2] As the Supreme Court explained in Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), “[tjhere is no question that an association may have standing in its own right to seek judicial relief for injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.... [e]ven in the absence of injury to itself, an association may have standing solely as a representative of its members.” 422 U.S. at 511, 95 S.Ct. 2197 (internal citations omitted).
The District Court held that CBP was unable to demonstrate a sufficiently concrete injury to itself or the parents it represents to have standing to bring this suit. Blunt, 262 F.R.D. at 486. In rejecting CBP’s claim of standing, the District Court focused on the fact that CBP is not *306 a student and therefore could only demonstrate “an abstract, ideological interest in the litigation as opposed to the necessary ‘personal stake in the outcome’ of the controversy necessary to confer standing.” Id. (citing Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).[3]
In his separate opinion, Judge Ambro states: “I would agree with Judge McKee that, under Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), CBP has standing to sue on its own behalf.” Ambro at 1. However, both Judge Ambro and Judge Green-berg believe that CBP’s standing is irrelevant because they do not believe CBP can prevail on the merits. Majority Opinion (“Majority Op.”) at 299 n. 72; Ambro at 1. Of course, CBP’s likelihood of success on the merits has no bearing on its standing. The issue of CBP’s standing not only “matter[s], it is of the utmost importance ...” as our decision here is precedential and can impact other organizations in the future. “In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.” Warth, 422 U.S. at 498, 95 S.Ct. 2197.
Moreover, the standing issue is disposi-tive for purposes of the merits of CBP’s appeal of the August 19, 2009 judgment because we are not affirming that judgment. As the Majority Opinion correctly notes, “[ajppeals are taken from judgments, not opinions.” Majority Op. at 299 n. 72 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). CBP appealed the District Court’s August 19, 2009 judgment. That judgment states: “the motion of defendants, the Lower Mer-ion School District and the Lower Merion School Board, to dismiss the claims of Concerned Black Parents of Mainline, Inc. and the Mainline Branch of the NAACP for lack of standing is GRANTED.” Joint Appendix (“J.A.”) at 42.69 (emphasis added). It is therefore beyond dispute that CBP was dismissed from the case because of standing, and only because of standing. Because a majority of this Court now holds that CBP does have standing, see, e.g., Majority Op. at 291, the District Court’s August 19, 2009 judgment must be reversed as to the dismissal of CBP.
Thus, it is simply inaccurate to claim that our holding regarding standing “does not change [the] outcome in light of a different majority’s conclusion that [the District Court] properly entered summary judgment against the plaintiffs.” Majority Op. at 302. The appeal from the District Court’s judgment granting summary judgment against the individual plaintiffs must be decided separately because it arises from a discrete judgment. See Chevron U.S.A., Inc., 467 U.S. at 842, 104 S.Ct. 2778. Furthermore, any suggestion that CBP must explain “why it could have prevailed where the individual plaintiffs did not,” see Majority Op. at 302, has no basis in the law. Because CBP was dismissed from the litigation on a motion to dismiss, *307 it was unable to engage in the same discovery as other parties; no summary judgment motion was filed against it and it therefore did not have a full opportunity to fairly oppose summary judgment.
When the District Court dismissed CBP for lack of standing, it did so without any motion to dismiss or motion for summary judgment being filed against CBP. The Majority is correct that the District Court considered CBP’s standing twice—once before the Third Amended Complaint and once after it—and discovery was taken after the first dismissal, Majority Op. at 283 n. 52. However, that does not resolve the procedural issue here. Plaintiffs filed for class certification. In opposing that certification, defendants argued that CBP could not serve as a class representative, but the defendants did not move to dismiss CBP from the lawsuit. J.A. at 918-19. Rather, the District Court sua sponte dismissed CBP for lack of standing. J.A. at 42.69.[4]
While the Majority is correct in noting that a judgment may be affirmed for any reason that is supported by the record, this record is more than adequate to survive summary judgment based on the standing of CBP as well as the individual plaintiffs. Judge Ambro and I agree that CBP has demonstrated that it is entitled to personal standing under Havens Realty Corp. Ambro at 1. However, unlike Judges Ambro and Greenberg, I also believe there is sufficient evidence to survive dismissal on the merits of the relevant discrimination claims. As I discuss in detail below, the District Court failed to properly credit some evidence, and improperly discredited or ignored other evidence. When the evidence here is properly viewed in its entirety, the record establishes genuine issues of material fact pertaining to Plaintiffs’ claims under Title VI and § 1983, and the resulting harm. See infra Section III at 30-60. CBP has also presented sufficient evidence to raise a genuine dispute of material fact regarding harm it suffered as a result of the LMSD’s conduct. See infra Section I.B at 7-19.
For these reasons, the August 19, 2009 order, must be reversed as to CBP’s dismissal for lack of standing; a majority of this Court now holds that CBP does have standing.
B. CBP’s Personal Standing
An organization has standing to assert its own injuries (“personal standing”) when it can show: (1) a concrete and particular *308 ized injury-in-fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood of redressa-bility. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); see also Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d 71, 76 (3d Cir.1998) (“In order to defeat the summary judgment motion based on the issue of standing, [the opposing party] was required to submit ‘affidavits or other evidence showing through specific facts ... that ... it [was] ‘directly’ affected [by the alleged discrimination]....’”) (emphasis in original).
To show an injury in fact, CBP must show that its activities or operations were sufficiently disrupted by the disputed conduct. In Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court held that the district court had erred in dismissing the claims of a nonprofit organization based on its alleged lack of standing. The nonprofit organization there (“HOME”) was committed “to mak[ing] equal opportunity in housing a reality in the Richmond Metropolitan Area.” Id. at 368, 102 S.Ct. 1114 (internal quotation marks and citations omitted). In furtherance of its mission, HOME counseled potential renters and undertook investigations to determine if landlords were discriminating against potential tenants by “steering” them to particular rental units or neighborhoods based on race. Id. at 368-69, 102 S.Ct. 1114. HOME sent “testers” of different races into the community where they inquired about advertised rental units to determine if certain landlords were engaged in racially discriminatory steering. Id. at 368, 102 S.Ct. 1114. As part of its investigation, HOME sent two testers to inquire about rental properties owned by Havens Realty Corporation (“Havens”). Id. The African-American tester was incorrectly told that certain apartments were not available. Id. Simultaneously, the Caucasian tester was told that the very same apartments were available. Id.
HOME sued Havens for housing discrimination, alleging that it had standing to sue in its own right and on behalf of its constituents. Id. HOME claimed it had itself been injured because Havens’ conduct “frustrated the organization’s counseling and referral services, with a consequent drain on resources.” Id.
The Supreme Court agreed. The Court reasoned that where an organization’s ability to provide its primary services has been “perceptibly impaired,” the organization has personal standing to attempt recover for its injuries. Id. at 379, 102 S.Ct. 1114. HOME asserted that it had “been frustrated by defendants’ racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.” Id. That was sufficient to allege an Article III injury. The Court explained: “[s]uch concrete and demonstrable injury to the organization’s activities—with the consequent drain on the organization’s resources—constitutes far more than simply a setback in the organization’s abstract social interests.” Id. Specifically, HOME’S complaint included an allegation that it “[had] to devote significant resources to identify and counteract the defendant’s [sic] racially discriminatory steering practices.” Id. (brackets in original). The additional expense and the need to counteract Havens’ allegedly discriminatory conduct was a sufficiently particularized and concrete injury to confer standing upon HOME. Id.
We elaborated on Havens Realty in Montgomery Newspapers. There, the defendants raised the same issues raised in Havens Realty, but on a motion for sum *309 mary judgment. 141 F.3d at 73. The plaintiff there was a nonprofit organization that worked “to educate and promote fair housing and to oppose segregation based on the protected classes found in the Fair Housing Act of 1968, as amended.” Id. In an effort to advance that objective, the organization sued multiple defendants, including a newspaper that had run advertisements that appeared to perpetuate housing discrimination on the basis of gender and familial status.[5] Id. The plaintiffs response to the defendant’s motion for summary judgment relied heavily on Havens Realty. The plaintiff argued that it had sufficiently alleged its own injuries because the defendant newspaper’s “acceptance and publication of discriminatory housing advertisements frustrated the organization’s mission and [damaged] the organization ... by ... diverting] resources to fight the discrimination.” Id.
We granted summary judgment to the defendants, but only because the plaintiff failed to offer any evidence to support its alleged injuries. “[S]omething more than ... naked allegations were required at the summary judgment stage.” Id. at 76. We explained that the nonprofit “was required to submit affidavits or other evidence showing through specific fads ... that ... it [was] directly affected by the alleged discrimination.” Id. (italics, brackets, and ellipses in original, bold emphasis added, internal quotation marks omitted). The organization had not produced any evidence that it had “altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation.” Id. at 78. “[B]are allegations of injury such as those based on the investigation described [there were] not enough to establish standing.” Id. (internal quotation marks omitted). Accordingly, we held that the organization had not established an Article III injury.
Thus, Montgomery Newspapers involved a failure of proof. It does not support the conclusion that CBP has failed to introduce sufficient evidence of its own injury to survive summary judgment here.
As discussed in detail below, CBP produced sufficient evidence of its own concrete and particularized injuries to create an Article III case or controversy. While it is obviously true (as the majority and the District Court note) that CBP is not itself a student within the LMSD, that circumstance is only minimally relevant at best.
In Powell v. Ridge, 189 F.3d 387, 391, 404 (3d Cir.1999), a case also brought under Title VI and § 1983, we stated that organizational plaintiffs that “devote substantial resources to overcoming what they allege are the disparate and inadequate educational programs caused by” the state’s failure to equally contribute funding and resources to minority school districts, had standing to sue on their own behalf.[6] We explained that “the standing of the plaintiff organizations to bring this suit is consistent with the long line of cases in which organizations have sued to enforce civil rights....” Id. at 404 (citing Walters v. National Ass’n of Radiation Survivors, 473 U.S. 305, 308, 105 S.Ct. 3180, 87 *310 L.Ed.2d 220 (1985); Havens Realty, 455 U.S. at 369, 102 S.Ct. 1114 (1985); Andrus v. Sierra Club, 442 U.S. 347, 352, 353 & n. 8, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1276 (D.C.Cir.1994); N.A.A.C.P v. The Medical Center, Inc., 657 F.2d 1322 (3d Cir.1981)). Some of the relevant organizational defendants in Powell such as “Parents Union for Public Schools” and “Parents United for Better Schools” had an organizational purpose quite similar to CBP’s, and the actions they took to advance that purpose were also quite similar to actions CBP undertook here. Id. at 387, 391.
Any focus on the fact that CBP is an organization of parents (rather than students) is particularly hard to understand in the context of the allegations of racial bias that underlie this lawsuit. The interests of children in the quality of their education is identical to the interests their parents have in seeing them obtain such an education without the poisonous sting of racial bias. The harm African-American students allegedly suffered here cannot readily be amputated from a concomitant harm to their parents or to an organization that devoted scarce resources to remedying it. After al 1, the nonprofit organization in Havens Realty had not been denied housing. Yet, the Supreme Court ruled that the nonprofit had standing to challenge discriminatory housing practices because it had been forced to devote its own resources to its efforts to remedy racial discrimination in the housing market. See Havens Realty, 455 U.S. at 379, 102 S.Ct. 1114.
Here, CBPs purpose includes efforts to “promote equity and excellence” in education for diverse students. It advances that purpose by addressing “issues related to education for populations identified as minority and/or African-American.” Blunt and CBP Appellants’ Br. at 11. There is no suggestion that this statement of purpose is inaccurate. Given that purpose, the record establishes that CBP has an interest in the outcome of the litigation, and that the alleged discriminatory conduct of LMSD negatively affects the organization’s central activities, requiring it to incur extra expenses and provide resources to mitigate LMSD’s conduct. Blunt, 262 F.R.D. at 486; see also J.A. at 3169.
Judge Greenberg lists several of the injuries that CBP alleges, but ignores the evidence produced to support those injuries. See Majority Op. at. 277. The following numbered headings recite some of the injuries Judge Greenberg lists, and the discussion that follows each heading explains where supporting evidence can be found in this record:[7]
Use of its resources to ‘host educational consultants and experts’ with the purpose of providing information to the Plaintiffs, class members, community and LMSD;
CBP hosted numerous educational events featuring educational consultants and experts. These experts were paid to speak to parents about the effects of the LMSD’s conduct and how to counteract the consequences of that conduct. CBP’s president, Loraine Carter, testified that, “[sjince 2006, [CBP has] coordinated public forums for parents in the community” by bringing in experts “to address the underachievement of African-Americans in the School District.” J.A. at 3167. Moreover, CBP’s newsletter references numerous *311 speaking events held each month with prominent scholars and educational leaders. Id. at 1495. For example, in January 2004, CBP met with Dr. Donald Clark regarding educational law, history, and policy as it pertains to both African-American students and Pennsylvania. Id. In February 2004, it arranged for Dr. Freya Rivers, an educational consultant, to speak at a CBP meeting regarding strategies she uses to identify high achieving children and “closing the achievement gap.” Id. CBP also listed the following activities, among others, in its Fall of 2004 schedule: “Special Education Action Roundtable; Youth Town Hall Meetings; Education Empowerment Sessions; Advocacy Training Sessions.” Id.
A ‘sharp’ rise in expenditures over the last five years due to its efforts to ‘protect its members from the adverse impact’ of ‘the inferior quality of LMSD’s dual system of education’;
There is evidence that CBP incurred expenses responding to the allegedly discriminatory conditions at LMSD and the resulting need to advocate on behalf of parents seeking to change the educational circumstances of their children. Id. at 3169. From December 2005 to March 2006, CBP had an income of approximately $1,090 and expenses of $1,106. Id. Like HOME in Havens Realty, CBP had to divert its scarce resources to counseling and otherwise supporting African-American families who were allegedly being discriminated against by LMSD, in order to minimize the impact of LMSD’s purportedly discriminatory attitudes and actions toward African-American students. Evidence that CBP’s expenses exceeded its income constitutes far more than the bare allegations of the complaint in Montgomery Newspapers; this evidence demonstrates that CBP suffered a discrete and cognizable injury as a result of LMSD’s conduct.
Expenditure of resources as a result of its attending meetings related to IEPs, Section 504 and ‘disciplinary meetings, court hearings and parent-teacher conferences with and/or on behalf of various plaintiffs, CBP members and class members;
Like HOME’S board members in Havens Realty, CBP’s board members had to attend LMSD’s educational and disciplinary meetings, as well as court hearings, on behalf of African-American students. Barbara Metzger, who worked as a special education teacher at LMSD during the relevant time period, testified in her deposition that on at least one occasion she “was invited to and sat in on a portion of a Concerned Black Parents’ conversation with some of the school administrators” regarding concerns that “African-American students, as a whole, ... were not performing at the same rate, not experiencing the same success as other students.” Id. at 1456. She also noted that, among other issues, CBP raised concerns that “these students didn’t feel welcome in the school.” Id. CBP engaged in dialogue with LMSD as part of their advocacy and counseling services for parents whose children were experiencing discrimination, in an effort to raise the concerns at issue in this case.
Publication of a community newsletter and ‘News Notes ... to disseminate the compilations of data on’ alleged racial disparities in application of disciplinary measures, segregation by race and ‘under achievement of African-American students in the [Lower Merion] District’;
CBP published and distributed numerous newsletters addressing claims of bias *312 in order to inform parents of LMSD’s conduct. For example, in Volume 1, Issue 3 of its “Main Line Voice” newsletter, CBP sought “a district-wide strategic plan to close the achievement gap,” citing statistics indicating that the same academic excellence that “characterizes the LMSD eludes more than sixty percent (60%) of its African-American students.” Id. at 1494. This newsletter also includes data demonstrating that African-Americans are statistically more likely than their Caucasian peers to have IEPs and significantly less likely to be classified as gifted. In fact, as I will discuss, for the years that were studied, the probability that an African-American student would be classified as “gifted” or assigned to an Advance Placement class was zero, as none were. M[8]
The ‘organization’ of educational, career, standardized test, financial aid, and college preparatory seminars.
Finally, there is ample evidence that CBP advocated for, and provided, college preparation resources that it believed African-American students needed because of LMSD’s purported failure to properly address their needs. In her deposition, Ms. Metzger mentioned a meeting she attended with school administrators where she raised numerous claims of discrimination on behalf of African-American students. CBP “believed that at times, guidance counselors or others, personnel, maybe didn’t afford [African-American students] the same consideration when it came to the college planning process.” Id. at 1456. Ms. Carter similarly testified that CBP has “met with a number of ... community organizations and institutions that we’ve identified to bring them together” with LMSD, to provide support to African-American students. Id. at 3406. Thus, CBP has demonstrated that it has provided career and college counseling services to the school’s African-American students to make up for services that it claims LMSD unfairly withheld from these students.
Judge Greenberg’s analysis suggests that these actions do not establish Article III injuries because “CBP’s very purpose relates to actions directly involving LMSD, and its expenditures were devoted to protecting students’ interests in their interactions with LMSD.” Majority Op. at 285. He believes this is different from HOME’S injuries in Havens Realty because “HOME’S purpose was to promote equality in the Richmond area overall and its interests thus went far beyond monitoring the specific actions at issue in the Havens case.” Id. To the extent that I understand that argument, it appears to be the classic distinction without a difference. CBP would not have had to undertake any of the actions or expenses detailed on this record absent the alleged racial bias of LMSD toward African-American students. The fact that CBP’s actions are focused on remedying the results of bias within a school district rather than promoting equality throughout the township of Lower Merion (or Montgomery County) is absolutely irrelevant. See Majority Op. at 277. Whether an organization monitors discrimination in a city or simply a school district does not affect whether it has standing to protect its own interests.[9] See Majority Op. at 277.[10]
*313 Moreover, nothing in this record supports Judge Greenberg’s suggestion that CBP’s expenditures relate solely to this litigation or that it is thereby trying to manufacture standing through litigation. See Majority Op. at 277 (“organizations may not satisfy the injury in fact requirement by making expenditures solely for the purpose of litigation.”) (internal citations omitted).
Judge Greenberg states: “CBP has failed to show why this particular litigation has frustrated its mission, or caused a ‘concrete and demonstrable’ injury to its activities.” Maj. Op. at 277.[11] However, that is not the issue. The issue is not whether the litigation has drained CBP’s resources, but whether CBP has had to devote its scarce resources to combating the perceived bias of LMSD and the inferi- or educational opportunities that CBP believes African-American students in that school district are afforded.
Moreover, this record establishes a diminution of CBP’s resources irrespective of any subsequent litigation. It is abundantly clear that the organization’s goal was not simply to advance litigation against LMSD, but to counteract and monitor LMSD’s day-to-day conduct. See, e.g., J.A. at 3169 (Carter testifying that in 2005-2006, CBP’s expenses exceeded its income). The impact on CBP’s scarce resources resulted from the organization’s response to the bias it believed African-American children in LMSD were subjected to, not from the litigation that was brought to address it. Judge Greenberg’s approach would result in a classic Catch22: nonprofit organizations that had devoted resources and incurred expenses to combat a particular activity would somehow lose their standing to sue if they decided that it was necessary to resort to litigation. Judge Greenberg’s observation that “CBP has failed to show why this particular litigation has frustrated its mission, or caused a ‘concrete and demonstrable’ injury to its activities,” Majority Op. at 277, therefore misses the point of the standing inquiry. The issue is not whether this litigation has drained CBP’s resources, but whether CBP’s efforts to combat perceived bias within the LMSD has drained CBP’s scarce resources. I do not doubt that the litigation has negatively impacted this nonprofit, but that is neither the beginning nor the end of our inquiry, nor should we focus on that one factor.
Moreover, even assuming that some of CBP’s activities and expenses were incurred as a result of litigation, summary judgment review requires drawing all reasonable inferences in favor of the non mov-ant and not against it. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 642 (3d Cir.1993) (“in the context of an appeal from summary judgment [we] must evaluate evidence in the light most favorable to [the nonmovant] and draw all inferences in his favor.”).
*314 CBP operates on the proverbial “shoe string” budget, and clearly had to divert its already-scaree resources to mitigating the impact of the conduct alleged here. See Havens Realty, 455 U.S. at 379, 102 S.Ct. 1114 (“[i]f, as broadly alleged, petitioners’ steering practices have perceptibly impaired HOME’S ability to provide counseling referral services for low—and moderate—income homeseekers, there can be no question that the organization has suffered injury in fact.”). The evidence supporting CBP’s assertions that it was injured by LMSD’s discriminatory conduct distinguishes this case from Montgomery Newspapers, and suffices to meet the standard for personal standing at the summary judgment stage. See Havens Realty, 455 U.S. at 379, 102 S.Ct. 1114.[12]
11. THE DISTRICT COURT APPLIED THE WRONG TEST TO APPELLANTS’ CLAIMS UNDER TITLE VI AND 42 U.S.C. § 1983
The District Court applied the wrong test in granting LMSD’s motion for summary judgment on Plaintiffs’ claims under Title VI and § 1983. As the Majority correctly notes, the appropriate standard for determining liability under Title VI is deliberate indifference. I note the following to amplify the Majority’s discussion of the appropriate standard for liability under Title VI and § 1983.
As the District Court notes, to establish a prima facie case under Title VI, plaintiffs must show that they: (1) were members of a protected class, (2) were qualified for the educational benefit or program at issue, (3) and that they suffered an adverse action, (4) which occurred under circumstances giving rise to an inference of discrimination. Blunt, 826 F.Supp.2d 749, 758 (E.D.Pa.2011) (internal citations omitted).
In order to establish a prima facie claim under 42 U.S.C. § 1983, plaintiffs needed to show that their right to be free from racial discrimination, as guaranteed by the Equal Protection Clause of the Fourteenth Amendment, was violated, and that the violation was committed by a person acting under the color of state law. See Chainey v. Street, 523 F.3d 200, 219 (3d Cir.2008).
The District Court concluded that both the § 1983 claim and the Title VI claims failed because Plaintiffs were unable to show a discriminatory purpose. The court determined that Plaintiffs failed to “put forth ‘more than a scintilla’ of evidence that the School District acted with a racially discriminatory purpose when identifying them as disabled and offering them special education services, even if this identification was somehow incorrect.” Blunt, 826 F.Supp.2d at 764 (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir.1989)).
According to the District Court, “there was no direct or circumstantial evidence of intentional racial discrimination by the School District,” and this was fatal to Plaintiffs’ claims. Id. at 762. However, the test for “intentional discrimination” that the District Court applied to reach that conclusion is inconsistent with decisions of the Supreme Court, our sister *315 Circuit Courts of Appeals, and our own precedential opinions. It is also inconsistent with the vast majority of courts that have interpreted the meaning of “discrimination” under statutes that are inextricably linked to, derived from, and applicable to provisions of Title VI. This is no minor concern because we cannot determine if there is sufficient evidence of Plaintiffs’ claims to withstand summary judgment unless the correct test for evaluating this record is first identified and applied.
In Pryor v. Nat’l Collegiate Athletic Ass’n, 288 F.3d 548 (3d Cir.2002), we emphasized that proof of disparate impact was not, by itself, sufficient to establish the requisite intent to discriminate under Title VI. Id. at 562 (“[a] mere awareness of the consequences of an otherwise neutral policy will not suffice” to establish intentional discrimination) (internal citations omitted). Rather, we held that, “[in order to] prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker (e.g., a state legislature) adopted the policy at issue ‘because of,’ not merely ‘in spite of its adverse effects upon an identifiable group.” Id. (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)) (internal quotation marks omitted). Our holding rested in large part upon Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).
However, as we explained recently in S.H. vs. Lower Merion School District, 729 F.3d 248, 264 n. 24 (3d Cir.2013), “Pryor [reached its result] because it equated deliberate indifference with disparate impact.” Id. at 264 n. 24 (citing Pryor, 288 F.3d at 568). S.H. relied upon the Supreme Court’s post-Sandoval jurisprudence as exemplified by Jackson v. Birmingham Bd. Of Educ., 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). There, the Supreme Court “[recognized] that deliberate indifference is a form of intentional discrimination.” S.H., 729 F.3d at 264 n. 24.[13] (Emphasis added).
Given our unequivocal pronouncement in S.H. that deliberate indifference “is a form of intentional discrimination, and not a pseudonym for disparate impact,” it is clear that the Plaintiffs here do not have to prove discriminatory animus, as the District Court held and as my colleagues’ analysis implies. Id. (emphasis in original). Of course, I appreciate the fact that the District Court did not have the benefit of our decision in S.H. when it granted summary in favor of the defendants. However, my colleagues and I do.
Although it is true that the claims in S.H. arose under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), not Title VI or § 1983, this is immaterial as the statutes are interrelated.
A. The Proper Test for Discriminatory Intent
1. Civil Rights Statutes and the “Deliberate Indifference” Standard
In order to avoid any confusion over the applicability of the deliberate indifference standard, its application under Title VI here, or the relevance of cases decided under certain other statutes, it is helpful to expound on the majority’s explanation of the relationship of Title VI to other civil rights statutes related to it, including the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and Title IX of the Educational Amendments of 1978 (“Title IX”). See Barnes v. Gorman, 536 *316 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Courts often look to the standard that applies under one of these statutes, to decide cases brought under one of the others. Id. The Supreme Court, this Court, and nearly all of our sister Courts of Appeals that have addressed the standard for establishing intentional discrimination under these interrelated civil rights statutes (the RA, ADA, and Title IX) have held that deliberate indifference can be sufficient to establish the required discriminatory intent. Evidence of discriminatory animus is not required.
a. The Interrelationship of Title VI, The RA, and the ADA.
As my colleagues note, the RA prohibits discrimination on the basis of disability in federally funded programs, including employment programs receiving federal financial assistance. 29 U.S.C. § 701 et seq. (1998). The ADA prohibits discrimination on the basis of disability in employment, public accommodations, public entities and transportation, and telecommunications. 42 U.S.C. § 12101 et seq. (2009). As noted above, the RA and ADA are coextensive with Title VI. Barnes, 536 U.S. at 185, 122 S.Ct. 2097 (2002); S.H. ex. rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 261 (3d Cir.2013). In Barnes, the Supreme Court explained: “the remedies for violations of ... the ADA and ... the [RA] are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in federally funded programs and activities.” 536 U.S. at 185, 122 S.Ct. 2097 (internal citation omitted). In S.H., we explained that:
Section 203 of the ADA states that the remedies available under § 202 of the ADA are the same remedies available under § 505 of the RA. Similarly, § 505 of the RA clearly states that the remedies available under § 504 of the RA shall be the same remedies available under Title VI of the Civil Rights Act of 1964.
S.H., 729 F.3d at 260-61.
Under both the RA and the ADA, “deliberate indifference is a form of intentional discrimination.... ” S.H., 729 F.3d at 264 n. 24 (emphasis in original) (internal citation omitted). Because the RA itself states that Title Vi’s rights and remedies should apply, the same deliberate indifference standard that applies under the RA should apply to claims brought under Title VI.
“Supreme Court precedent construing Title VI governs enforcement of the RA and the ADA as well,” because both laws were modeled on Title VI. S.H., 729 F.3d at 261 (internal citations omitted).
When we decided S.H., this was an issue of first impression for us. Id. at 260 (“We have not yet spoken on this issue.”). We therefore took pains to explain our inquiry into “[w]hich standard to apply—discriminatory animus or deliberate indifference ... ”, and we provided a thorough explanation of our decision to adopt the majority rule. We explained that our discussion was (at least in part) in response to the Eleventh Circuit’s observation that “despite the adoption of the deliberate indifference standard by many of our sister courts, ‘there has been little explication for the conclusion that intentional discrimination under the RA may be established by deliberate indifference.’ ” Id. at 263 (quoting Liese v. Indian River County Hosp. Dist., 701 F.3d 334, 345 (11th Cir.2012)).
b. Title VI and Title IX.
Fewer than ten years after Title VI was passed, Congress enacted Title IX of the Education Amendments of 1972 (“Title IX”) to protect against gender-based dis *317 crimination in federally funded educational programs. 20 U.S.C. § 1681 (2014) (“No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.”). Congress explicitly modeled Title IX on Title VI. “Except for the substitution of the word ‘sex’ in Title IX to replace the words ‘race, color, or national origin’ in Title VI, the two statutes use identical language to describe the benefited class.” Cannon v. Univ. of Chicago, 441 U.S. 677, 694-95, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).
Given the interrelated nature of the statutes, “[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.” Id. at 696, 99 S.Ct. 1946; see also Barnes v. Gorman, 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (“The Court has interpreted Title IX consistently with Title VI ... ”); Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 254-58, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) (“Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.”) (internal citations omitted). The standard for intentional discrimination under Title IX is clearly deliberate indifference. Davis v. Monroe County Board of Education, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
In Davis, a parent brought suit against the Monroe County Board of Education because her fifth-grade daughter had been repeatedly sexually harassed by another student in her class. Davis, 526 U.S. at 632-33, 119 S.Ct. 1661. The harassed student (LaShonda) and her family reported the harassing student’s conduct to various school officials, including her teachers and the principal. Id. at 634, 119 S.Ct. 1661. The harassing student was eventually charged with, and pled guilty to, sexual battery for harassing LaShonda and others. Id. In the suit that followed, the plaintiffs alleged that, despite the fact that the student pled guilty, the school took no disciplinary action in response to LaShon-da’s repeated complaints, and it failed to make any effort to protect LaShonda by separating her from the harassing student. Id. at 635, 119 S.Ct. 1661. The defendants argued that plaintiffs needed to demonstrate that the defendants themselves had actually harassed LaShonda, not simply that they had ignored her harassment at the hands of another student. Id. at 636, 119 S.Ct. 1661. The Supreme Court relied on Gebser, and held that the school board could itself be liable for sexual harassment under Title IX if it was deliberately indifferent to the peer-on-peer sexual harassment. Id. at 641-43, 119 S.Ct. 1661 (“Gebser thus established that a recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination.”) (internal citations omitted)(emphasis added).
The rational for allowing deliberate indifference to establish intentional discrimination under Title VI is further illustrated by limitations and obligations arising from the Sending Clause authority that each of the analogous statutes is based upon.
c. The Relevance of the Spending Clause
Title VI, Title IX, the RA and the ADA are all based on the same exercise of congressional power under the Spending *318 Clause. U.S. Const. art. 1, § 8, cl. 1. Guardians Ass’n, 463 U.S. at 598-99, 103 S.Ct. 3221 (1983) (opinion of White, J.)(Title VI); Gebser, 524 U.S. at 287, 118 S.Ct. 1989 (Title IX); S.H., 729 F.3d at 264 (RA and ADA).
In Gebser, the Supreme Court explained how the source of congressional authority in enacting Title IX and Title VI informed interpretation of the statutes:
Title IX’s contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. Our central concern in that regard is with ensuring that “the receiving entity of federal funds [has] notice that it will be liable for a monetary award.”
Gebser, 524 U.S. at 287-88, 118 S.Ct. 1989 (emphasis added) (internal citations omitted).
In S.H. we explained:
[t]he RA and ADA were enacted under Congress’s Spending Clause power; legislation that is enacted under this power ‘is much in the nature of a contract’ between the federal government and recipients of federal funds and “[t]he Supreme Court has thus reasoned that a recipient of federal funding, such as the School District here, may be held liable for money damages only when it is on notice by statute that it has violated the law.”).
729 F.3d at 264 (internal citations omitted).
Under the Spending Clause analysis of S.H., animus is not a condition precedent to a contractual breach. Rather, intent to breach can be assumed from knowledge of a set of circumstances, and a refusal to remedy them. This is true whether the law in question prohibits gender-based discrimination under Title IX, disability-based discrimination under the ADA or RA, or racial discrimination as is alleged here under Title VI.
2. The District Court’s Approach is Inconsistent with the Decision of Every Other Circuit Court That Has Decided This Issue
Every Circuit Court of Appeals that has addressed this issue has held that the heightened discriminatory animus standard does not apply to Title VI claims.[14] See Bryant v. Independent School District No. 1-38 of Garvin County, Oklahoma, 334 F.3d 928, 933-34 (10th Cir.2003); Zeno v. Pine Plains Central School District, 702 F.3d 655, 665 n. 10 (2d Cir.2012) (“Although the harassment in Davis, and the ‘deliberate indifference’ standard outlined by the Supreme Court, arose under Title IX, we have endorsed the Davis framework in cases of third-party harassment outside the scope of Title IX.”) (internal citations omitted); Monteiro v. Tempe Union High School Dist., 158 F.3d 1022, *319 1034-35 (9th Cir.1998) (internal citations omitted); Liese v. Indian River County Hospital District, 701 F.3d 334, 347-49 (11th Cir.2012) (applying deliberate indifference to a disability discrimination case because the RA is based on Title VI, where deliberate indifference would be sufficient to show discriminatory intent).
In Bryant, the Court of Appeals for the Tenth Circuit relied on Davis in adjudicating a Title VI hostile environment claim. Bryant, 334 F.3d at 934. Plaintiffs there were students who alleged that they were subject to a racially hostile school environment. Id. at 931. The relevant school officials were “aware of the racial slurs, graffiti inscribed in school furniture, and notes placed in students’ lockers and notebooks” and yet, “[t]he principal affirmatively chose to take no action.” Id. at 932-33. While noting that the offending conduct must be intentional to pass muster under Title VI, the Tenth Circuit explained: “[c]hoiee implicates intent” lest “school administrators ... sit idly, or intentionally, by while horrible acts of discrimination occurred on their grounds by and to students in their charge.” Id. at 933. The court added: “when administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable” under Title VI. Id.
The court instructed the district court on remand: to apply the test from Davis v. Monroe County Board of Education to a Title VI hostile school environment claim because Congress based Title IX on Title VI; therefore, the Court’s analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa).
Id. at 934. We should remand and do the same here.
The Plaintiffs here may not be able to ultimately convince a fact finder that they should prevail under Title VI or § 1983, but they have clearly produced sufficient evidence to survive summary judgment, and they are clearly entitled to have the correct legal standard of deliberate indifference applied to their proof.
III. THIS RECORD AND SUMMARY JUDGMENT
My colleagues readily concede the difficulty of proving a discriminatory motive and the concomitant necessity of allowing plaintiffs to rely solely on circumstantial evidence. See Majority Op. at 269 (“individuals who violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence, but instead ‘cover their tracks’ by providing alternate explanations for their actions.”). We have discussed this in some detail in the context of claims of job discrimination. In Aman v. Cort Furniture, 85 F.3d 1074, 1082 (3d Cir.1996), we stated: “defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it.” This is especially true since those who harbor conscious (as opposed to subliminal) bias may attempt to “cover their tracks[.]” Majority Op. at 275.
Thus, bias will sometimes manifest itself only in subtle ways that the actor him/herself may not even be cognizant of. In Cort Furniture, we explained that “Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.” 95 F.3d at 1082. In Coombs v. Diguglielmo, 616 F.3d 255, 264 (3d Cir.2010), in discussing the possible unconscious bias of a prosecutor in striking *320 Black jurors we explained, “[ljike anyone else, trial attorneys possess those human frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result.” Surely, teachers in our public schools, even though they may not be acting out of racial animus or conscious bias, are no less human, and no more immune to the “frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result,” than attorneys are.
This does not eliminate the Plaintiffs’ need to produce enough evidence to survive a motion for summary judgment. However, the nature of the fact to be proven must inform a court’s analysis of the evidence that is produced. If Plaintiffs have produced enough evidence to raise a genuine issue of material fact as to Defendants’ deliberate indifference, Plaintiffs are entitled to their day in court on their Title VI and § 1983 claims whether the deliberate indifference is borne of deliberate animus or the more insidious poison of social conditioning.[15] Here, plaintiffs’ proof is more than sufficient to establish a genuine dispute of material fact, especially if we consider the ephemeral nature of the racially caused deliberate indifference they must prove.
A. The Summary Judgment Standard Has Been Ignored
I reiterate that a court may not “weigh the disputed evidence and decide which is more probative,” when deciding a motion for summary judgment. Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 67 (3d Cir.1996) (internal citations omitted) (holding that the district court erred in ruling that a plaintiff had failed to offer any evidence to survive summary judgment on its discrimination claim where the district court had simply discounted plaintiffs admissible evidence as less probative than defendant’s.). Similarly, courts may not “make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party’s evidence ‘is to be believed[,] and all justifiable inferences are to be drawn in his favor.’ ” Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
The District Court did acknowledge the Plaintiffs’ “[ejvidence of procedural irregularities” in the way some of the children were erroneously placed into special education classes. Blunt, 826 F.Supp.2d at 760. Yet, the court dismissively refused to admit it based upon the court’s belief that “there must be some evidence that irregularities were related to plaintiffs’ race.” Id. Thus, the Plaintiffs were denied the benefit of all reasonable inferences in defending against summary judgment and they were also expected to prove a negative by dispelling all causes for the “procedural irregularities” other than race.
After demanding that Plaintiffs prove the irregularities here were tied to race— irregularities that my colleagues ignore, the District Court not only failed to afford the Plaintiffs the inference demanded by summary judgment, the court ignored evidence that was relevant to the very racial nexus the court demanded proof of.
As I will explain below, the Plaintiffs’ expert examined the extent to which African-American students are overrepresent *321 ed in LMSD’s special education classes while being completely absent from any “high expectation” college prep or advanced placement classes, and concluded both as a matter of statistical science as well as common sense that those numbers indicate “there is something systematic about the LMSD practices related to Ethnicity.” J.A. at 1676 (emphasis added). There is other evidence, that I will discuss, that is easily sufficient to create a genuine dispute of material fact if the record is properly viewed in its totality.
Any appropriately flexible inquiry, if guided by the correct legal test of deliberate indifference, would have realized the potential for a fact finder to conclude that Plaintiffs have met their burden based on all of the circumstantial evidence here. I reiterate: at this point, the burden is merely to produce sufficient evidence that there is a genuine dispute of material fact. Plaintiffs do not have to prove their case to survive summary judgment, and they are entitled to the benefit of all reasonable inferences.
Circumstantial evidence (which all involved concede is not only permissible but necessary in such cases) is nothing more than a fact derived from an inference drawn from proof of underlying circumstances. See Black’s Law Dictionary 18c (9th ed.2009). That is exactly what we have here. Although I do not suggest that this record would necessarily result in a reasonable fact finder inferring a racial motive based on deliberate indifference, such a finding would clearly be supported by this record, even absent the evidentiary equivalent of a “smoking gun.”
I am thus at a complete loss to understand how the District Court could have looked at this record and concluded that Plaintiffs had “not put forth more than a scintilla of evidence that the LMSD had acted with a racially discriminatory purpose [i.e. deliberate indifference] in identifying them as disabled and placing them in special education courses....” See Majority Op. at 297.
Although we are assured that plaintiffs in cases such as this need not produce the proverbial “smoking gun,” it certainly appears that after today, they will be required to produce something akin to evidence of either a muzzle flash or a surveillance video in order to survive summary judgment.
In affirming this grant of summary judgment, my colleagues note that there “was no evidence presented in the District Court that the LMSD applied different evaluation procedures for determining placement of African-American students than for Caucasian students.” Majority Op. at 300. There does not have to be.[16]
There is an expert’s conclusion that there is statistically significant evidence of African American being disproportionately assigned to special education classes while none are enrolled in advanced placement or “high expectation classes.” We know that the African-American students who are plaintiffs here were placed in special education classes even though their tests *322 did not indicate such a placement was warranted and/or that deficiencies were relied on for such placements that did not justify a special education placement.[17] This is evidence that was dismissed, even though we should be mindful of the difficulties of proof in such cases and that bias is no longer “worn on sleeves” or “carried on signs.”
Moreover, as I have already explained, no evidence of different testing or separate evaluation procedures is required. Although such evidence would certainly have advanced the Plaintiffs’ claim of racial bias, its absence is far from fatal to those claims given the other evidence on this record. Whether or not the procedural irregularities in the erroneous and improper placement of these African-American students in special education classes was the result of bias (i.e. deliberate indifference), ineptitude, or coincidence should not be decided on summary judgment given the Plaintiffs’ evidence.
My colleagues acknowledge that “plaintiffs’ expert, a psychologist [concluded] that five or six of the students in question incorrectly had been identified as learning disabled ...” Majority Op. at 300. Yet they attach no evidentiary significance to the fact that nearly every individual African-American student in this suit was improperly placed in special education classes, because that expert opinion “was not rendered until these proceedings were pending in the District Court....” Majority Op. at 300. I do not understand how that bears on whether the Plaintiffs submitted sufficient evidence to survive summary judgment in the District Court, and the absence of legal citation or explanation of why this is the least bit relevant does not encourage comfort in such a strange principle. Indeed, I have no idea why one would go to the trouble and expense of obtaining an expert opinion about alleged improprieties before the evidence was required as proof in a judicial proceeding. The expert opinion was before the District Court when it ruled on the Defendants’ motion for summary judgment.[18]
Although the abuse of discretion standard that governs our review of the District Court’s evidentiary rulings is quite deferential, it is not insurmountable and focusing on the deference properly afforded an evidentiary ruling ought not to substitute for an objective analysis of whether the ruling was an abuse of discretion.
Thus, even if it was proper to ignore the MAP PowerPoint and all of Dr. Moore-Williams’ testimony (and it was not), which I discuss in detail below, the remaining record should still have precluded summary judgment. “The totality of the evidence ... must guide our analysis rather than the strength of each individual argument.” Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir.1997). Yet my colleagues attempt to “explain[ ] each of the discrepancies in [the] record in isolation and conclude[ ] that none of them creates a material issue of fact.” Id. (internal citation omitted). “[S]uch an analysis is improper in a discrimination case.” Id; see also Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990) (“A play cannot be *323 understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on the individual incidents, but on the overall scenario.”).
B. Plaintiffs’ Statistical Evidence was Not Properly Credited,
Plaintiffs’ proof consists in part of strong statistical evidence. It is summarized in the following chart that is based on data collected by the Pennsylvania Department of Education:

Total student body at LMSD Students Participating in special education courses

Year % of total % of number total of number Total students of Number who were students of African who were students American Caucasian Total Number of students that %of total student body that % of special % of education special participated in participated in students education special special who were students education education African who were courses courses American Caucasian
'05—'06 6,945 7.7% 84.4% 1,255 18.1% 12.7% 82.6%
'06-'07 6,981 7.9% 83.2% 1,187 17:0% 14.5% 80.2%
'07-'08 6,914 8.1% 83.1% 1,158 16.7% 14.0% ■ 80.8%
'08-'09 6,788 8.0% 81.6% 1,101 16.2% 13.7% 80.5%
'09-'10 7,072 8.6% 81.1% 1,094 15.5 14.3% 80.0%
Majority Op. at 289-90.
My colleagues ignore the force of these numbers by stating that “[djisporportionality is not per se evidence of discrimination, [...] [because disproportionality] can be either biased or unbiased.” Majority Op. at 300 (internal quotation marks and citations omitted). Although that is true, recitation of that general principle does not justify adopting a wholly dismissive attitude toward the evidence of disproportionally in the LMSD, or considering it in isolation from other evidence.
For the five-year span captured by these numbers, the percentage of Caucasian students in special education classes in LMSD was roughly equivalent to, though always less than, the total percentage of Caucasian students in the LMSD student body. For most of that time frame, the percentage of African-American students enrolled in special education classes in LMSD was twice the percentage of the number of African-Americans in the student body. These percentages do not exist in a vacuum.
1. Plaintiffs’ Expert Dr. Conroy Placed the Statistical Evidence in Context
Plaintiffs produced the testimony of an expert witness, Dr. James W. Conroy, Ph.D, who studied enrollment and student placement in the various courses at LMSD.[19] He found that, while African- *324 American students were greatly overrepresented in “low expectation” classes, they were dramatically underrepresented in more demanding college preparatory and advanced placement courses. J.A. at 1671-74. “The pattern is that these courses with the highest proportions of Black students tend strongly to be courses that I would label as ‘low expectations’ courses.” Id., at 1673-74 (italics added).
Conroy also examined the racial composition of the twelve advanced or “high expectation” classes. He found that in 2008, not only were African-American students underrepresented in those classes; the percentage of African-American students in “high expectation” classes was “zero.” Id. at 1674-75 (emphasis in original). In other words, not a single African-American student was assigned to any of the twelve high expectation classes in LMSD in 2008.[20] Id. Lest one think 2008 was a fluke or a statistical aberration, Conroy found exactly the same pattern “for each of the years 2005, 2006, 2007, and 2008.” Id. at 1675. For each of those years not a single African-American student was assigned to a college prep or “high expectation” class in this school district.
Conroy testified that the extent of this disparity was “ ‘significant’ in the statistical sense.” Id. at 1676. In fact, Conroy concluded that the disproportionally in LMSD was so evident that one need not be an expert in statistics to grasp its significance. Rather, he believed that “[t]he Lower Merion population data may be judged practically significant by simple observation of large differences in the kinds of courses students [sic] Black and Others students wind up in.” Id. at 1677 (emphasis in original). His conclusion, rejected by the District Court as a matter of law, was that: “there is something systematic about the LMSD practices related to Ethnicity.” Id. at 1676 (emphasis in original).
The Majority states that “[t]he District Court ... discussed in detail the statistical data that the plaintiffs put forward.” Majority Op. at 300. Yet, both my colleagues and the District Court ignore that absolutely no African-American students were placed in “high expectation” classes during the period examined by Conroy, and the Majority fails to note that the District Court ignored the expert conclusion that LMSD employed these “practices related to Ethnicity.” However, even if the statistics could properly be viewed in isolation, the issue remains not whether those disparities establish deliberate indifference, but whether they create an issue of fact about African-American students’ placement in “low expectation classes” during this time frame, which was a period when LMSD did not place a single African-American student into any “high expectation” college prep or Advanced Placement test.
The Majority attempts to further minimize the evidentiary value of this testimony by noting that:
[t]he Supreme Court also has rejected the use of particular standard deviations or ‘any alternative mathematical standard’ in estabhshing a prima facie case of employment discrimination, and has stressed that the significance or sub-stantiality of numerical disparities must be judged on a case-by-case basis ... [and they] must be sufficiently substantial that they raise an inference of causation.
*325 Majority Op. at 276 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)).
There are other problems with the Majority’s attempt to ignore the force of the statistical evidence. First, in Watson, the Court was deciding whether a statistically based disparate impact analysis was applicable to a claim of disparate treatment in a “subjective or discretionary promotion system.” 487 U.S. at 999, 108 S.Ct. 2777. The Court said nothing that would assist us in determining the propriety of a sample size or the probative force of the “deviation” here. Indeed, the Court’s only mention of “deviation” was the following reference in a footnote:
Courts have also referred to the ‘standard deviation’ analysis sometimes used in jury selection cases. We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of ‘standard deviations’ can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination.
Id. at 995 n. 3, 108 S.Ct. 2777 (internal citations omitted).
The Majority seems concerned with the sample size here as well as the significance of the deviation. They cite to Watson, stating: “the Supreme Court has explained that neither the ‘courts nor defendants [are] obliged to assume that plaintiffs’ statistical evidence is reliable,’ and has cited, for example, the weaknesses inherent in small or incomplete data sets and/or inadequate statistical techniques.” Majority Op. at 276 (internal citation omitted). That is clearly true as a general proposition, but I do not understand how that general proposition advances our inquiry. There is nothing on this record to suggest that the Plaintiffs’ experts’ statistical analysis is flawed, that the data set is “incomplete and/or inadequate,” or that their experts’ statistical techniques are flawed. The District Court made no such finding and it appears that LMSD did not make any such argument to the district court.
The issue in Watson was whether a disparate impact analysis could be used to establish disparate treatment in an employment discrimination suit involving a discretionary promotion system at a bank having 80 employees—far fewer than the numbers involved here. There, the African-American plaintiff had attempted to use statistical evidence of the paucity of African-Americans who had been promoted at the bank, in order to establish her disparate treatment claim that the bank had failed to promote her because of her race. The Supreme Court held that statistical evidence of disparate impact could be used to establish a prima facie case of disparate treatment but rejected the position of some courts that looked to EEOC Uniform Guidelines on Employment Selection Procedures. Those courts had “adopted an enforcement rule under which adverse impact” would “not ordinarily be inferred unless the members of a particular ... group [were] selected at a rate that [was] less than four-fifths of the rate at which the group with the highest rate [was] selected.” Watson, 487 U.S. at 995 n. 3, 108 S.Ct. 2777. The Court restated the “useful role that statistical methods can have in Title VII cases,” but cautioned that it had “not suggested that any particular number of ‘standard deviations’ can determine whether a plaintiff has made out a prima facie case....” Id. (emphasis added).
The situation here is remarkably different. In order to establish deliberate indifference under the theory advanced here, Plaintiffs had to first establish that Afri *326 can-American students were being placed in “low expectation” classes at a significantly disproportionate rate to Caucasian students. Even my colleagues seem to concede that the record establishes that, and LMSD does not really deny that. Any dispute about statistical sampling, standard deviations, and “z scores,” is beside the point.
2. There are Issues Regarding Defendants’ Expert’s Methodology
Plaintiffs’ expert explained his methodology in great detail and we have only my colleagues’ countervailing implied mastery of statistics to dismiss the statistical validity of Plaintiffs’ expert’s conclusions. My colleagues’ concern about such statistical terms of art as: “data sets” and “statistical techniques” and sample size, is even more puzzling when one considers that the Defendants’ expert, Dr. Daniel Reschly, reached a conclusion that was contrary to Plaintiffs’ expert based on a much smaller sample size. Reschly only looked at two years of student placements as opposed to the five years that Conroy used to reach a conclusion about the role of race in LMSD’s placements. Moreover, Reschly admitted that his inquiry was hurried and that he did not request additional information required to perform the kind of analysis he would otherwise have conducted because there was insufficient time. J.A. at 2979. Id. at 2590.
Although I do not address the Majority’s rejection of Plaintiffs’ appeal of the District Court’s decision to consider Reschly’s evidence without subjecting it to a Daubert hearing, I neither agree with that decision, nor do I understand why the District Court denied the requested Daubert hearing. I do not discuss it in detail because that ruling has no bearing on whether Plaintiffs offered enough evidence to survive summary judgment. If Reschly’s report could withstand a Daubert inquiry, we have a classic battle of the experts that a jury should resolve. If it is not admitted under Daubert, the record still contains a factual issue that must be decided by a jury-
I do note that my colleagues misstate the Plaintiffs’ basis for challenging the District Court’s denial of their request for a Daubert hearing. My colleagues suggest that Plaintiffs’ objection to Reschly’s report “lies with one paragraph.” Majority Op. at 296. That is the District Court’s acceptance of Reschly’s definition of “dis-proportionality.” My colleagues explain their rejection of this claim as follows: “[w]e find this use of Reschly’s wording to define disproportionality to be immaterial to the outcome of this litigation.” Id.
However, there are many more issues with Reschly’s report than the definition of “disproportonality,” and these are set forth in the Memorandum of Law filed in support of Plaintiffs’ Daubert Motion to Partially Exclude and/or Limit the Report and Testimony of Daniel J. Reschly, Ph.D. J.A. at 2916. Arguably, there are numerous problems with Reschly’s report, including the fact that he admitted that he did not have enough time to conduct the kind of comparison he otherwise would have, the files he compared were selected by agents of LMSD, and he only compared two years of class assignments.
The issue for us is not, of course, which expert is correct. Rather we should only be concerned with whether this disagreement raises a genuine dispute of material fact. The majority does not believe it does because my colleagues simply reject the statistical evidence supporting the Plaintiffs’ claim of bias. That is improper. See Federal Laboratories v. Barringer Research, Ltd., 696 F.2d 271, 274 (3d Cir.1982) (“A court may not ... resolve ‘disputed and relevant factual issues on con *327 flicting affidavits of qualified experts.’ Nor is it at liberty to disbelieve the good faith statements of experts contained in depositions or affidavits and presented by the non-moving party”) (internal citations omitted).
Although my colleagues cite to Teamsters v. United States, 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), they manage to overlook the thrust of the Court’s analysis there. In Teamsters, the defendant employer argued that “statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a prima fa-cie case shifting to the employer the burden of rebutting the inference raised by the figures.” 431 U.S. at 338, 97 S.Ct. 1843. The Court rejected the defendant’s attempt to minimize the importance of statistical analysis by explaining: “our cases make it unmistakably clear that ‘[statistical analyses have served and will continue to serve an important role’ in cases in which the existence of discrimination is a disputed issue.” 431 U.S. at 338, 97 S.Ct. 1843, (brackets in original). This is such a case.
Moreover, the invocation of the maxim that statistics cannot “by themselves” establish discriminatory intent, should not obscure the fact that there is “more,” on this record. There is much more. Thus, even if the opinion of the Plaintiffs’ expert could not, by itself, raise an issue of fact, it is neither proper nor fair to discuss Plaintiffs’ proof as if they were only relying on that evidence to establish an issue of fact about discriminatory intent under the deliberate indifference standard.
C. Evidence of a “MAP” Program was Improperly Excluded and Raises a Dispute of Fact.
Before discussing the MAP evidence, it is helpful to reiterate the nature of the disputed factual issues in this case. As my colleagues readily concede, proof of intent can rarely be achieved by direct evidence. See Majority Op. at 269. Accordingly, as noted earlier, “[cjourts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and a plaintiffs ability, to prove discrimination [i.e. deliberate indifference rising to the level of discriminatory intent] indirectly, circumstantially, must not be crippled ... because of crabbed notions of relevance or excessive mistrust of juries.” Cort Furniture, 85 F.3d at 1082 (internal quotation marks omitted, ellipsis in original).
Moreover, the practical problems of proof in cases such as this counsel in favor of the same kind of practical assessment of proof that the courts have adopted pursuant to the Supreme Court’s McDonnell Douglas burden shifting analysis. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The District Court acknowledged the flexible nature of the proof required to establish a prima facie case. The court explained: “the prima facie case is flexible and must be tailored to fit the specific context in which it is applied.” 826 F.Supp.2d at 758 (quoting Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.2003)) (internal citation and quotation marks omitted). Yet, the court’s inquiry was inconsistent with the flexible approach the court acknowledged it must adopt.
With respect to the MAP presentation and the attendant authentication testimony from Dr. Barbara Moore-Williams, the District Court and the Majority commit different errors. The District Court abused its discretion by failing to admit the MAP presentation because it held that the document was improperly authenticat *328 ed under Federal Rule of Evidence 901(a). On the other hand, the Majority ostensibly does not contest the admissibility of the document and instead simply holds that it is insufficient to demonstrate that the LMSD intentionally discriminated against plaintiffs. Such a position is problematic because it places an improper burden on the Plaintiffs, and again transgresses into fact-finding. The MAP testimony is admissible and admissibility—not probative weight, is the focus of a summary judgment inquiry.
As an initial matter, it is important to understand what the MAP presentation is. During discovery, LMSD disclosed a PowerPoint presentation entitled “Minority Achievement Program” (MAP) on LMSD letterhead dated October 2010 that the District Court deemed inadmissible because it was not properly authenticated. That was an abuse of discretion that had a very significant impact on this litigation, and threw one more obstacle in the path of having a jury determine the validity of Plaintiffs’ allegations against this school district.
The MAP “document lists alleged characteristics of African-American students, including a preference for ‘tactile learning’ and ‘[sjubdued lighting’ that they ‘[r]ely heavily on visual input rather than auditory input,’ and that they ‘[rjeact intensely to being praised or criticized.’ ” Blunt, 826 F.Supp.2d at 761 (brackets in original). The District Court refused to consider the contents of the brochure because “the record does not reveal who created this document or under what circumstances and what position the creator or creators occupied within the School District. There is no evidence that the purported presentation was ever used.” Id. The majority agrees with the District Court that the fundamental problem with admitting the MAP testimony is the lack of evidence that it was used, noting that it “assume[s] the contention that this presentation, if used by LMSD, would provide evidence of discriminatory intent, or deliberate indifference to a third party’s discriminatory intent.” Majority Op. at 295.
Dr. Barbara Moore-Williams, Ed. D. is an educational consultant retained by LMSD to assist LMSD in addressing issues of racial disparity in educational placements. She was retained by LMSD’s Assistant Principal after he saw her give a presentation at a consortium of area schools. J.A. at 1410. Her presentation addressed the issue of “cultural proficiency” and educational success “as a national issue.” Id. at 1411. According to Moore-Williams, the Assistant Principal was apparently interested in retaining her because he thought her work and information would be helpful to LMSD. Id. at 1410. Her work focused on “cultural proficiency among staff that teach children who are not their culture, their race, their ethnicity, and the need to pay attention to African-American males who are struggling in America to get an education....” Id.
The District Court refused to consider the entirety of Dr. Moore-Williams’s testimony that LMSD “discriminated against African-Americans” because she also testified that “there is racism in all school districts and that Lower Merion School District’s problems are no different from any other suburban school district.” Blunt, 826 F.Supp.2d at 761.[21] The District Court thought that Dr. Moore-Williams’ testimony was little more than *329 her “personal belief and hearsay statements of others.” Id. The District Court concluded that for these reasons, “her statements cannot create a genuine issue of material fact regarding the School District’s intent to discriminate.” Id. My colleagues agree. Majority Op. at 288-89. Regardless, parts of her testimony were nevertheless admissible for the purpose of shedding light on the MAP PowerPoint.
As I have just noted, that PowerPoint purported to list several things that were characteristic of the way African-American students learn. It stated in part:
“Many African-American students prefer:
more kinesthetic/tactile learning, subdued lighting rather than bright light, rely heavily on visual input rather than auditory input, respond to cooperative learning, simultaneous talk instead of alternating talk, to study while music or conversation occurs in the room ... outer-directed rather than egocentric focus, more active environments v. sedentary learning environments of American Schools, rely more on information from their surroundings.
J.A. at 1838. During her deposition, Moore-Williams was asked if she had “ever heard a teacher or a staff member from Lower Merion School District discuss the use of visual input rather than auditory input in their classrooms.” Id. at 1414. She affirmed that she had. Id. She was then asked about each of the items listed in the MAP PowerPoint. Id. Counsel referred to them by their place on the list. Id. Although she had not heard teachers refer to each of the bullet points, she had heard teachers refer to some of them. Id. The following exchange occurred as counsel took Moore-Williams through the PowerPoint:
Q. [W]ith regard to the fourth bullet point concerning highly cooperative learning?
A. Yes.
Q. That has been implemented?
A. Yes.
Q. And has the fifth bullet point concerning simultaneous talk instead alternating talk been implemented in Lower Mer-ion School District?
A. Yes.
Q. And what about the use of music of conversation in the room while studying?
A. I haven’t heard.
Q. And that was the sixth bullet point. Now, what about the seventh bullet point concerning the outer-directed rather than egocentric focus?
A. No.
Q. And what about the eighth bullet point concerning, I believe you said, more active environments versus sedentary learning environments.?
A. Yes.
Q. And how have teachers described ... active environments versus sedentary learning environments with African-American students in the district?
A. Kind of along with cooperative learning, because cooperative learning is active. So it’s in conjunction with, we need to do more things where the kids are up and about and interacting with each other.[22]
Id. at 1414.
Although Moore-Williams could not corroborate that the MAP PowerPoint prés- *330 entation had been used in its entirety, the District Court abused its discretion by so focusing on the generalities of her beliefs about the extent to which all public schools are infected with some degree of racism that it overlooked the fact that her testimony was relevant to establishing the very fact the District Court found lacking—that teachers had adopted the MAP PowerPoint (at least in part).
My colleagues conclude that because “Dr. Moore-Williams did not testify about the MAP presentation itself,” it necessarily follows that her testimony “does not establish who prepared the presentation, or whether LMSD ever used it or for what purpose.” Majority Op. at 295. The conclusion fails to consider the detail with which Moore-Williams referred to the presentation.
More importantly, it does not refute the admissibility of the testimony or the presentation. While the District Court disputed the authenticity of the presentation, the Majority does not identify any such failure to meet the requirements of Federal Rule of Evidence 901(a). Perhaps this is because authentication under Federal Rule of Evidence 901(a) is an incredibly “slight” burden, which may be satisfied by simply producing “evidence sufficient to support a finding that the item is what the proponent claims it is.” Fed.R.Evid. 901(a).
My colleagues concede that Moore-Williams “indicated that she heard of certain bullet points,” but they argue that “she noted that they were not related to African-American students. At most, her testimony is relevant to the extent that she heard from LMSD personnel that they used different teaching strategies for particular students.” Majority Op. at 295. My colleagues then dismiss the probative value of Moore-Williams’ testimony because she did not testify that she heard teachers specifically connect the MAP strategies to African-American students. However, the portion of the MAP document quoted above begins with the statement: “Many African-American students prefer ... ”. The fact that Moore-Williams did not hear teachers mention African-American students when discussing the unique learning styles suggested in the MAP presentation is clearly fodder for defense counsel’s closing argument at trial. It is not a reason to ignore the existence of a disputed fact. While Moore-Williams’ testimony need only place relevant “dots” into evidence, Plaintiffs should be able to rely on the resulting inferences to connect them. They should not, however, have to explicitly connect all of the dots, color in the resulting image, and frame the picture to survive summary judgment. There is enough on the record to support an inference that the distinct teaching approaches were aimed at African-American students given the language of the MAP presentation and the specificity of Moore-Williams’ testimony about what she heard certain teachers discussing.
Moore-Williams’ testimony, taken along with the evidence itself, clearly supports a reasonable inference that LMSD both was a proprietor of and, through their teachers and other personnel, used the MAP. The document is on LMSD’s letterhead in its header and LMSD supplied it in discovery. There is no suggestion that it was fabricated, and neither the Majority nor the District Court contest the veracity of the document. Yet, because Plaintiffs could not identify the author of this document it was deemed inadmissible.
As a final matter, the Majority contends that the District Court properly rejected Moore-Williams’ testimony as inadmissible hearsay. Majority Op. at 288-89. However, Moore-Williams was testifying about statements teachers made to her about the conclusions in the MAP. It certainly ap *331 pears that the statements were made by teachers acting within the scope of their duties as teachers at LMSD, and neither my colleagues nor the District Court suggest anything to the contrary. Accordingly, those statements were not hearsay. They were party opponent admissions. See Fed.R.Evid. 801(d)(2)(D) (noting that a statement is not hearsay when “[t]he statement is offered against an opposing party and ... was made by the party’s agent or employee on a matter within the scope of that relationship and while it existed.”).
D. Testimony of Psychologists and Parents Supports Plaintiffs’ Contention that Race is a Factor in Assigning Students to Special Education Classes
Plaintiffs produced the expert Rebuttal Report of Tawanna J. Jones, Ed. S. Certified School Psychologist. See id. at 2306. Her Curriculum Vitae was attached to her report, and her expertise in the appropriate areas is not disputed.[23] She was retained by Plaintiffs to rebut the expert report of Reschly, LMSD’s expert. Jones was specifically asked to give her expert opinion about “whether: (1) each of the student Plaintiffs were properly identified by [LMSD] as having a learning disability; (2) based on LMSD’s placement of each student Plaintiffs [sic] into low level and/or special education classes, were the student Plaintiffs denied the equality of education they should have otherwise received....” Id. at 2307-08. Jones found that the students whose files she reviewed were erroneously evaluated by the school district. See J.A. at 2318-20. Specifically, as discussed below, three of the plaintiffs, Q.G, C.H., and S.H., were incorrectly placed in special education courses although they did not meet the criteria for placement in those courses. Id. Jones’s testimony is corroborated and supported by the testimony of Dr. Barbara Shapiro, Ph.D. the Assistant Director of Pupil Services, who supervised school psychologists at LMSD.
Jones opined that Plaintiff Q.G., an African-American student at LMSD, “was incorrectly identified by LMSD as a student who met the criteria for a Learning Disability in the area of Language Arts.” Id. at 2318. She added: “[a]s an initial matter of import, Language Arts is not a disability category.” Id. at 2318 (emphasis in original). Thus, even assuming the accuracy of LMSD’s conclusion that Q.G. was deficient in Language Arts, according to the undisputed testimony of Plaintiffs’ expert, that should not have resulted in Q.G. being placed in special education classes. Q.G.’s academic skills then declined over time “after being placed in Special Education.” Id. at 2319 (emphasis in original).
The dubious nature of Q.G.’s placement based on a single deficiency is corroborated by the testimony of Shapiro. Shapiro began working in the LMSD in the fall of 2003 as Assistant Director of Pupil Services. J.A. at 1387. She supervised ten school psychologists in that capacity until March 1, 2009, during that time she “collaborated with the special ed supervisors regarding special ed services district wide.” Id.
Shapiro testified that no student should ever be placed into special education *332 classes based on one score. Id. at 1393. “As a psychologist, you would look at the entire picture of a child and never just determine a disability based on one piece of information.” Id. Yet, that was not the process used to place Q.G. in special education classes that she did not need, and which impeded her educational development.
Shapiro also testified that LMSD did not comply with the American Psychological Association’s protocol for record retention. J.A. at 1397. This meant that testing protocols that determined students’ placement in classes were sometimes destroyed before parents could examine (and thereby challenge) them. Although parents were informed that they had a right to request these protocols, Shapiro did not believe that parents were ever informed of this shortened retention policy. The result was that parents would often ask to see their child’s testing protocols, only to learn they had already been disposed of. Id.[24]
Jones also opined that the initial evaluation for another African-American student, Plaintiff C.H., “provided a clear indication, that there were deficits and needs in the areas of Reading Comprehension and Basic reading skills (reading decoding).” However, “[t]here was no evidence, ... that she met the criteria for SLD [specific learning disability] in the area of Written Expression or Mathematics.” Id. at 2319. Jones believed that the absence of data made it impossible to give C.H. the support she needed to address the one area where she appeared deficient, and still allow her to progress normally in the areas where the need for such support was not indicated. Id. at 2319-20.
Jones’ evaluation of yet another student, Plaintiff S.H., may be the most troubling. “All of S.H.’s skills and abilities measured in the ‘Average’ range at the point of the initial assessment.... Despite the lack of evidence required to determine eligibility, the evaluator labeled S.H. as meeting the criteria for a SLD and subsequently doomed S.H. to an academic experience [in specialed—low expectation courses] that impeded her development rather than remediated or accelerated her academic progress.” Id. at 2320. According to Dr. Jones, “[i]t is evident from the data provided that S.H. was never a candidate for Special Education under the auspices of a SLD.” Id. In her view, “[i]t is apparent that subsequent evaluators either were not aware of the criteria for a SLD or intentionally chose to ignore the criteria as demonstrated by the fact that S.H.’s not initially meeting the criteria for SLD was never subsequently addressed by LMSD.” Id.
S.H.’s mother testified that she did not believe her daughter was denied educational services per se, but was troubled because S.H. was placed in lower level courses that were not demanding. S.H.’s mother did not initially object to the placement because she received letters from LMSD informing her that S.H. was receiving reading support, which S.H.’s mother interpreted as giving her daughter extra help. She said that “[Njobody in the school told [her] that it was a remedial course, no. I just thought it was an enrichment. It was presented as an enrichment course to help kids with reading. So, to me, more is better.”[25] Id. at 1165. *333 Like most of the parents here, S.H.’s mother did not initially object because she trusted the school officials and assumed they were acting in S.H.’s best interests. S.H.’s mother testified that she finally objected to S.H.’s placement after an independent psychologist evaluated S.H. in tenth grade and concluded that S.H. did not have a learning disability. According to the mother, the school then gave her “pushback.” Id. at 1167; see generally, id. at 1153-67. This pushback demonstrates that the school was aware of the issues involved in S.H.’s placement, and responded in a manner that a jury could conclude was deliberately indifferent.
The differing kinds of omissions and irregularities evidenced by Dr. Jones’ assessment of the placements of Q.G., C.H., S.H., as well as Shapiro’s testimony, reflect some of the difficulties in the way this case has been litigated as well as some of the conceptual difficulties and confusion inherent in the litigation posture here. Indeed, counsel for CBP addressed this concern at oral argument:
The general confusion in this case is that initially there were special-education claims in the case; those claims were dismissed because of failure to exhaust. There were also Title VI claims. What happened was, through the course of discovery and though the process of evaluations, the children discovered that ... most of them had never had the disabilities that the district said they had.[26]
Transcript of Oral Argument at 17, Blunt v. Lower Merion School District, 767 F.3d 247 (Nos. 11-4200, 11-4201, 11-4315). At the risk of repetition: “the totality of the evidence ... must guide our analysis rather than the strength of each individual argument.” Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir.1997).
In response to this glaring evidence in support of Plaintiffs’ claims that they were placed into special education classes because of their race rather than their relative academic need, the Majority simply makes a blanket assertion that “if the same evaluation procedures are used for all students or [sic] their race there is simply no discrimination.” Majority Op. at 300. This statement is deeply problematic for two reasons. First, it assumes that the procedures themselves cannot be discriminatory. Second, and most importantly here, it assumes the “procedures” comprise the whole of the evaluation, thus ignoring the discretion and subjectivity afforded the examiner who is applying the procedures and interpreting the results of the evaluations.
As noted above, clearly the procedures were not applied appropriately with respect to Plaintiffs. LMSD’s own Assistant Director of Pupil Services testified that procedures were not followed, including those for dictating which students should be placed in special education classes. See supra at 280-81. For instance, as noted above, LMSD evaluated Q.G. as having a learning disability in the subject of language arts, which is not even a disability *334 category. J.A. at 2318. This directly belies the Majority’s broad assertion that as long as the procedures are neutral, the consequences cannot, as a matter of law, be considered discriminatory. Similar procedures and evaluative tools can always be applied in patently discriminatory ways, and evidence of their misapplication with respect to the Plaintiffs is certainly evidence of discrimination and deliberate indifference. See infra n.16 at 34.
It is, of course, possible to argue that the errors in placement on this record are simply the result of the district’s less than desirable and inartful method of selecting students for special education classes. Mistakes can surely happen, especially in such a complicated, subtle and intricate process as identifying students who cannot handle regular academic work in a classroom. However, LMSD had every opportunity to come forward with evidence that numbers of White students are also mistakenly placed in special education classes and that could have negated the causal nexus of the erroneous placement of these African-American plaintiffs. It offered no such evidence.
Even if it could be argued that the decision to forego production of any such evidence results from political considerations rather than absence of such proof (and nothing on this record supports such rank speculation), the fact remains that this record only contains evidence of African-American students erroneously being labeled as “learning disabled” and being denied the full benefits of a public education. There is no evidence of this happening with White students and the inference that Plaintiffs are entitled to should prevent the LMSD from getting an eviden-tiary bye. Moreover, to the extent that innocent mistakes happen in placement, it should be noted that, where the more challenging curricula is concerned, all such mistakes seem to happen in only one direction. There were no African-American students in “high expectation,” college prep or advanced placement classes in the school district during the years the experts studied. Speculation about diagnostic error is simply that—“speculation;” it should play no role in our legal inquiry.
F. There is Testimony that Teachers and School Administrators Had Notice of These Allegations
Plaintiffs have also put forward sufficient evidence of deliberate indifference. They established that LMSD was aware of the racial problems arising from the classroom assignments and provision of resources, and it ignored Plaintiffs’ requests to remedy the racial disparities. As noted in the section on CBP’s standing above, Ms. Metzger, a former special education teacher at LMSD, testified that as a teacher she “was invited to and sat in on a portion of a Concerned Black Parents conversation with some of the school administrators.” J.A. at 1456. At this meeting, parents and students raised concerns that “African-American students, as a whole, as we have discussed, were not performing at the same rate, not experiencing the same success as other students; that [African American families in the District] believed that [African American] students didn’t feel welcome in the school; that [African American families in the District] believed that at times, guidance counselors or others, personnel, maybe didn’t afford the same consideration when it came to the college planning process.” Id. (emphasis added). As Metzger’s testimony makes clear, the “school administrators” who attended this meeting along with her had notice that African American families had complained that they were not receiving the same education as their peers, and, yet, nothing changed.
*335 In addition, as I discussed above, when the mother of one of these plaintiffs objected to her daughter being identified as having a learning disability, the school gave her “pushback,” rather than undertaking an inquiry into the appropriateness of her daughter’s placement in special education. J.A. at 1167.
IV. CONCLUSION
We all recognize the difficulty of identifying students who are best served by the kind of remediation that special education classes are intended to provide, and that no process of evaluation is perfect. However, this ease is not about second-guessing the placement of students in remedial classes. It is not about frustrated hopes of parents or students. And, despite the specter of the The Quota Boogey man raised by the Majority,[27] it is not about how many African-American students should be placed in a particular academic track.
This case is about whether courts will allow plaintiffs who have produced the kind of proof that I have discussed above to survive summary judgment and have their day in court to prove something as subjective and evasive as the deliberate indifference that is tantamount to racial bias.
When plaintiffs can produce the kind of evidence that has been produced here, the law requires that their ultimate claims of bias be determined by a fact finder, not by a court. As Judge Baylson stated in Doe 1 v. Lower Merion Sch. Dist.: “The Supreme Court has clarified that [d]etermin-ing whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” 689 F.Supp.2d at 755. (emphasis in original, internal quotation marks omitted). That is sorely lacking here.
I also note the laudable caution of Judge Baylson in Doe 1, in explaining: “[this] Court is particularly reluctant to grant summary judgment and to deny Plaintiffs the right to trial in this case, which involves issues of public policy and great concern to the community.” Id.
I therefore must respectfully disagree with my colleagues’ belief that the District' Court did not err in concluding that no genuine dispute of material fact exists on this record.

. Judge Greenberg properly notes that his discussion of CBP’s standing is not the holding of this Court, because Judge Ambro agrees that CBP has personal standing. See Majority Opinion ("Majority Op.”) at 291-92 & n. 72. However, for reasons of convenience and clarity, with the exception of Judge Greenberg’s discussion of personal standing, I frequently refer to his opinion in its entirety as the "Majority Opinion,” or the opinion of "my colleagues.”
Judge Greenberg engages in a very detailed analysis to explain why he believes that CBP lacks standing. He explains that such a detailed analysis is appropriate because "[w]e ... will not avoid deciding the standing issue on the ground that it is moot, for the necessity for a party to have standing is jurisdictional and thus a court of appeals always must determine if the district court ... had jurisdiction.” Majority Op. at 290 n. 62. However, there is no dispute whatsoever about the standing of the individual plaintiffs, nor could there be. Accordingly, the jurisdiction of the District Court and this Court is clear and undisputed. Accordingly, Judge Greenberg’s discussion of standing is dicta. See Galli v. New Jersey Meadowlands Comm’n, 490 F.3d 265, 274 (3d Cir.2007) ("[W]e are not bound by our Court’s prior dicta .... ”).
Nevertheless, in order to respond to Judge Greenberg's very detailed analysis, and to avoid any questions about the impact of our discussion on future suits by organizational plaintiffs, I will discuss CBP's standing in some detail.

. The District Court also held that CBP did not have representational standing because its bylaws stated that CBP had no members, and "in light of this express statement in a formal document governing ... the corporation, [the ■ District Court concluded] that [CBP] does not have standing to bring suit on behalf of its members because it has none.” Id. at 487. I do not discuss the issue of whether CBP has representational standing because there is no need to. Judge Ambro and I agree that CBP has standing to sue based on its own injuries. I do note that the District Court failed to appreciate the extent or nature of CBP’s own injuries or the nature of CBP’s efforts to advance the interests of parents of African-American children in the LMSD.

. Although the District Court notes that defendants "move to dismiss the claims of Concerned Black Parents ... for lack of standing,” J.A. at 924-25, defendants’ motion makes no such claim. Instead, as part of its argument that plaintiffs’ proposed class representatives cannot adequately represent the class, defendants' motion states: "Plaintiffs' evidence does nothing to establish CBP's standing and completely fails to address the fact that CBP is not a member of the proposed class and therefore cannot be a class representative.” J.A. at 919.
Plaintiffs were neither required, nor expected, to present evidence to establish CBP’s standing in order to move for class certification. It is therefore not the least bit surprising that they did not then attempt to come forward with evidence to establish standing. It appears that the District Court focused on the defendants’ comment about standing and transformed it into a motion attacking standing. J.A. at 928. The District Court then focused on CBP’s lack of formal membership, and concluded that CBP "does not have standing to bring suit on behalf of its members,” ostensibly addressing plaintiffs’ claims that CBP may represent the class. J.A. at 932. The District Court then concluded: “[a]ccordingly, we will enter an order dismissing Concerned Black parents from this lawsuit for lack of standing.” Id. The District Court does not state that it is granting summary judgment against CBP for lack of standing. Rather, it simply stated that it was "dismissing” CBP. Id.

. "The complaint included copies of six advertisements which appeared in Montgomery newspapers between November, 1993 and March, 1994. Each of these advertisements contained one of the following allegedly objectionable phrases: 'mature person’, 'ideal for quiet and reserved single and-or couple’; ‘professional male ... only' and ‘quiet mature setting.’ ” Montgomery Newspapers, 141 F.3d at 73.

. Disapproved of on other grounds in Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir.2009).

. Majority Op. at 277 (citing TAC at 25-26; J.A. vol. 9, at 3871-72) (footnote omitted) (I have added bracketed numbers and bold emphasis for ease of reference).

. I will discuss such evidence in detail below in order to explain how the District Court erred in concluding that there was no genuine dispute of material fact. See supra 272-85.

. As noted above, in Powell v. Ridge, this Court held that an organizational plaintiff similar to CBP contesting discrimination in a local school district had personal standing to assert its claims. Powell, 189 F.3d at 391, 404. Thus, it is incorrect to argue that an organizational plaintiff representing the interests of students in the school district is unable *313 to make a personal standing claim under Havens. Id. (citing to Havens Realty Corp., 455 U.S. at 369, 102 S.Ct. 1114); Majority Op. at 277-78.

. Therefore, Judge Greenberg’s observation that "[i]t appears that the alleged additional expenditures were consistent with CBP’s typical activities and it is thus unclear the effect, if any, that this litigation had on their expenditures,” Majority Op. at 286, misses the point. CBP’s activities were all focused upon combating the effects of the racial bias alleged in LMSD toward African-American students. The fact that it had to make additional expenditures to combat any particular action or to mitigate the impact of the alleged bias is irrelevant to its standing.

. In addition, far from frustrating CBP’s mission, this litigation is absolutely consistent with that mission.

. Judge Greenberg cites La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir.2010) (an out of circuit case that is obviously not binding) for the proposition that an organization “must ... show that it would have suffered some other injury if it had not diverted resources to counteracting the problem” in order to demonstrate standing. Majority Op. at 277. However, we have never imposed any such impediment to Article III standing. This additional hurdle is simply contrary to the minimal injury required under Article III. See, e.g., Havens Realty Corp., 455 U.S. at 377, 102 S.Ct. 1114.

. Jackson cited Gebser, and both involved claims filed under Title IX. However, as I have already mentioned, and as I explain in greater detail below, that is a distinction without a difference.

. In S.H., we identified two Courts of Appeals that appeared to adopt a minority position. The First Circuit in Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126-27 (1st Cir. 2003) and the Fifth Circuit in Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 575 (5th Cir.2002). However, neither decision actually adopts a "minority rule.” Nieves-Marquez never rejected the "deliberate indifference” standard as a form of intentional discrimination. Similarly, in Delano-Pyle, the Court of Appeals for the Fifth Circuit did not affirmatively require discriminatory animus to establish intentional discrimination under the RA and ADA. Instead, the court affirmed the jury’s verdict based on intentional discrimination.

. For an interesting discussion of the neurological science underlying the subtleties of bias that we discussed in Cort Furniture and Coombs, see John A. Bargh, "Our Unconscious Mind: How Unconscious Thought and Perception Affect Our Every Waking Moment,” Scientific American, Dec. 17, 2013, available at http://www.scientificamerican. com/article/how-unconscious-thoughtand-perception-affect-our-every-waking-moment/

. A relevant article from the highly respected periodical mentioned above (n.15) contains a helpful illustration of why my colleagues’ approach to claims of bias is both misguided and naive: "A college admissions officer might zero in on a less than stellar grade in an otherwise solid medical school application from a prospective minority student without realizing those same negative features are not weighted so heavily for the other applicants.” Bargh supra note 16 at 34. As I discuss below, it appears here that African-American students may well have been placed in special education classes based on evaluations that did not warrant such a placement. It is therefore irrelevant that the same evaluations were used to place White students in special education classes.

. And this does not even include evidence that should have been admitted but was erroneously labeled "hearsay,” or could not survive an overly rigorous authentication requirement.

. The District Court never even mentioned the fact that the record contained evidence that the level of disproportionality was statistically significant, and that it showed "there is something systematic about the LMSD practices related to Ethnicity.” J.A. at 1676.

. Although it is not necessary to note Con-roy's qualifications at this stage, it is important to consider that it includes "39 years of research in disability, education, and health issues among children and adults,” and since graduating Cum Laude, from Yale and earning his Ph. D. in Medical Sociology from Temple University, "With Distinction,” he has qualified as an expert in disability research, disability policy, special education and statistical analysis. J.A. at 1670.

. Those classes included: Latin 3H, AP Calculus BC, IB Senior Project, IB Theory of Knowledge, Economics H, IB History of Americas HL 2, IB English Al HL (Part 2), Art 2 H, AP Spanish Language, AP Physics C Electromagnetism, and Organic Chemistry H. J.A. at 1674.

. When asked directly whether, based on her experience and conversations with LMSD personnel regarding prejudice in the teaching staff, there was any prejudice in the teaching staff, she stated that “[bjased on [her] experience, there's prejudice in everybody. So, yes, there’s prejudice in the Lower Merion School District.” J.A. at 1412.

. "Cooperative learning” is the 14th bullet point on the MAP PowerPoint: "Function better under cooperative conditions.” J.A. at 1838.

. Jones was then serving as a Certified School Psychologist for the School District of Philadelphia. Her primary responsibilities included evaluating students and determining eligibility for Special Education Services. She was also a collaborative team member working to ensure proper student placement, provision of adequate services, "development of appropriate behavioral and academic goals, and transition planning for post-secondary options.” J.A. at 2306.

. I mention this evidence merely to illustrate the extent to which Plaintiffs raised genuine disputes of material facts regarding those claims and they should have been resolved by a fact finder. I am not suggesting that this necessarily proves nefarious conduct by LMSD employees.

. Although the District Court held that S.H.’s mother's testimony was inadmissible with respect to other issues (third hand ac *333 counts of teachers’ statements to students), this testimony does not provide any such problem.

. The District Court commented on what it must have seen as a “moving target” by noting: “[i]n their brief in opposition to the motion for summary judgment, plaintiffs now assert that they are not disabled and were wrongly placed in special education programs on the basis of race. This assertion that they are not disabled is in stark contrast to the Third Amended Complaint ...” Blunt, 826 F.Supp.2d at 753. Ftowever, for purposes of deciding the summary judgment motion, the District Court assumed that the student plaintiffs were "in fact not disabled.” Id. at 754 n. 4.

. See Majority Op. at 290 (“We certainly are not going to require or even suggest that school districts use a quota system in assigning students to special education classes [to achieve proportionality].”).